**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JEANEEN WILLIAMS,<br>    obo R.M.,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>    Commissioner of Social Security,<br><br>        Defendant. | CASE NO.  1:11-cv-2135<br><br>MAGISTRATE JUDGE<br>VECCHIARELLI<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff, Jeaneen Williams ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying the application of Plaintiff's daughter, E.W. ("the claimant"), for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.     PROCEDURAL HISTORY

On May 19, 2009, an application for SSI was filed on behalf of the claimant.  (Tr. 9.)  The application was denied initially and upon reconsideration, so a hearing before an administrative law judge ("ALJ") was requested.  (Tr. 9.)  On March 2, 2011, an ALJ held the claimant's hearing by video conference.  (Tr. 9.)  The claimant participated in the hearing and was represented by an attorney.  (Tr. 9.)  Plaintiff also participated in the hearing.  (Tr. 9.)  On April 22, 2011, the ALJ found the claimant not disabled.  (Tr. 21.)  On September 6, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 9, 2011, Plaintiff filed a complaint on behalf of the claimant to challenge the Commissioner's final decision.  (Doc. No. 1.)  On March 27, 2012, Plaintiff filed her Brief on the Merits.  (Doc. No. 14.)  On May 11, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 15.)  Plaintiff did not file a reply brief.

Plaintiff asserts that substantial evidence supports the conclusion the claimant is markedly limited in at least two domains of functioning and, therefore, is disabled.[1]

---

[1] Plaintiff also asserts in the Conclusion section of her brief that, "[a]t the very least, remand is appropriate . . . for the ALJ to obtain medical expert testimony to assist in making a determination with respect to the severity of the limitations in these domains."  (Pl.'s Br. 18.)  The Court reminds Plaintiff that, in its Initial Order in this case, the Court instructed the parties that "[t]he arguments should be in the "Argument" or "Analysis" section of the brief."  (Doc. No. 6.)  In any event, Plaintiff has presented no legal argument or analysis in support of her assertion, so the Court will not consider it.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995–996 (6th Cir.1997)).

2

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was a school-aged child on the date her application for SSI was filed, and she was an adolescent at the time of her hearing. (Tr. 12.) She had not engaged in substantial gainful activity at any time relevant to the disposition of her application. (Tr. 12.)

### B. Medical Evidence

On October 7, 2008, Plaintiff and the claimant presented to Dr. Inga Sriubiene, M.D., and Dr. Jyoti Krishna, M.D., for an evaluation of the claimant's snoring, restless sleep, and daytime sleepiness. (Tr. 236.) Dr. Sriubiene indicated that Plaintiff reported the following. The claimant had always been a "sleepy child," but since the claimant entered the fifth grade her daytime sleepiness increased significantly. (Tr. 236.) Plaintiff began work very early, before the claimant had to go to school. (Tr. 236.) Plaintiff awoke the claimant between 3:30 and 5:30 in the morning and took her to a babysitter, where the claimant napped until it was time to go to school. (Tr. 236.) But the claimant's sleepiness was present before Plaintiff began this routine. (Tr. 236.) Further, "delayed rise times on the weekends [did] not fully help to prevent napping/sleepiness in the daytime." (Tr. 236.)

The claimant took several unintentional naps during the day: she took a 15-minute nap while being transported from her home to her babysitter's home before school, and a 15-minute nap at her babysitter's home before school; she napped "several times per day" while at school; she slept from 3:30 to 5:00 or 6:00 at her

babysitter's home after school; and she napped for 15 minutes while being transported home. (Tr. 237.) The claimant fell asleep at unusual times or places such as while watching television or talking to someone, and this happened more than four times a week. (Tr. 237.)

The claimant slept through most of the night and reinitiated sleep easily after awakening (although the claimant stated that she believed she needed some time to fall back asleep); and she was not difficult to awaken in the morning and was "overall described to be refreshed." (Tr. 237.) The claimant was in the seventh grade and was taking special education classes, and her performance at school was "not deemed to be a significant problem at this time." (Tr. 238.)

Dr. Sriubiene indicated upon examination that the claimant was alert and cooperative but quiet; not in distress; and able to communicate verbally well and follow directions. (Tr. 239.) Dr. Sriubiene diagnosed Plaintiff with hypersomnia, a possible sleep-related breathing disorder caused by her obesity, a possible sleep-related movement disorder that caused restless sleep, and behavior-induced insufficient sleep syndrome. (Tr. 240.)

On May 7, 2009, Plaintiff and the claimant presented to Dr. Michael Macknin, M.D., for a routine check-up of the claimant. (Tr. 231.) Dr. Macknin indicated that Plaintiff reported the following about the claimant. The claimant was "always tired despite good night sleep[, and f]alls asleep all day long in school, during conversations, [and] doing anything at all." (Tr. 231.) She was in the seventh grade and performing poorly (receiving mostly C's and D's), but she was improving. (Tr. 232.) Dr. Mackinin's assessment of the claimant was that she was a "well child" with a sleep disturbance.

4

(Tr. 232.)

On June 15, 2009, Plaintiff and the claimant presented to Dr. Krishna and certified nurse practitioner Jennifer Sciuva for a follow-up on the claimant's sleep problems. (Tr. 247.) Dr. Krishna and Ms. Sciuva indicated that Plaintiff reported the claimant's symptoms essentially remained unchanged; the claimant was entering the eighth grade; and the claimant's grades were poor (D's and F's). (Tr. 247.) Dr. Krishna and Ms. Sciuva assessed the claimant with hypersomnia not otherwise specified and noted that the claimant's "sleep and wake schedule" was "questionable." (Tr. 247.) They "[d]iscussed in length sleep hygiene and need for proper amount of sleep and consistent wake and sleep pattern." (Tr. 247.) They also ordered sleep studies and advised Plaintiff that the claimant "should get proper amounts of sleep (9 hours at least nightly) for seven days prior to sleep testing." (Tr. 247.)

On July 27, 2009, the claimant underwent a sleep study with Dr. Sally Ibrahim, M.D. (Tr. 253-54.) Dr. Ibrahim indicated that the test demonstrated "severe hypersomnolence." (Tr. 253.) However, Dr. Ibrahim noted that "caution should be taken with making a clinical diagnosis [of narcolepsy] due to lack of documentation of sleep hours (no sleep logs/actigraphy) prior to testing, as sleep deprivation may confound the results of this study," and that "further clinical correlation is advised." (Tr. 253.)

On December 2, 2009, Plaintiff and the claimant presented to Dr. Krishna and Dr. Gul Khan, M.D., for a follow-up on the claimant's sleep problems. (Tr. 313-15.) Dr. Krishna and Dr. Khan indicated that the claimant had been given Ritalin, and that Plaintiff reported the following. (Tr. 313.) The Ritalin "has helped control [the

5

claimant's] sleepiness tremendously," and the claimant did not suffer side effects from the medication. (Tr. 313, 314.) The claimant was "functioning better in school" and had "[n]o naps," although the "[w]orst part of the day is in the late afternoon." (Tr. 313.) The doctors instructed that the claimant continue on Ritalin, be vigilant of any side effects, and follow up in six months. (Tr. 315.)

On March 10, 2010, the claimant underwent a consultative examination with clinical psychologist Michael B. Leach, Ph.D., upon referral from the Bureau of Disability Determination. (Tr. 300-05.) Dr. Leach indicated that Plaintiff reported the following. The claimant had never seen a psychiatrist or psychologist but had been evaluated at school. (Tr. 301.) The claimant had been prescribed Ritalin for narcolepsy and exhibited some improvement while on the medication. (Tr. 301.) The claimant "has no problems with her behavior,"[2] but "has problems staying awake which interferes with her learning." (Tr. 301.) The claimant had a group of friends with whom she socialized, which consisted mainly of her cousins. (Tr. 303.)

Dr. Leach further indicated upon examination that the claimant "exhibited no difficulty with interpersonal interactions in that she was polite, cooperative, and gave her

---

[2] Dr. Leach indicated that Plaintiff elaborated on the claimant's behavior as follows:

> [The claimant] has no problems with cursing and stealing. She does not refuse to do chores and does as she is told. She does not have any trouble with fire setting or running away. She is not physically aggressive, violent and will not destroy property. She is not cruel to animals. She has no problems with incontinence. [She] has never been involved with the Juvenile Court. She has no trouble getting along with her siblings and peers. She can care for her hygiene.

(Tr. 301.)

6

best effort to interact." (Tr. 304.) However, the claimant "did fall asleep during the interview and although [Plaintiff] reports that the Ritalin helps control the narcolepsy, obviously it's still a problem." (Tr. 304.)

Dr. Leach concluded that the claimant was mildly impaired (3/4 age appropriate) in her social development because of her limited understanding associated with a borderline IQ; moderately impaired (2/3 age appropriate) in her personal and behavioral development because of her narcolepsy; and mildly impaired (3/4 age appropriate) in her concentration and persistence because of her narcolepsy. (Tr. 304.)

On April 1, 2010, state agency consultative psychologist Aracelis Rivera, Psy.D., reviewed the claimant's records, assessed the claimant's functioning upon reconsideration, and concluded that the claimant was less than markedly limited in all domains of functioning except the domain of moving about and manipulating objects, in which domain the claimant had no limitation. (Tr. 309-10.)

### C. Reports from the Claimant's School

In an undated Teacher Questionnaire, intervention specialist Hazel Edwards indicated the following regarding the claimant. (Tr. 143-50.) The claimant was in the eighth grade, and Ms. Edwards knew the claimant for one school year. (Tr. 143.) Plaintiff had problems functioning in the domain of attending and completing tasks. (Tr. 145.) Specifically, the claimant had a "serious problem" with focusing long enough to finish assigned work activities or tasks; waiting to take turns; and working at a reasonable pace and finishing tasks on time. (Tr. 145.) When she waited to take turns, "she might fall asleep." (Tr. 145.) The claimant's sleepiness made it "very difficult for her to keep up with the other students." (Tr. 145.)

Ms. Edwards further checked a box indicating that the claimant had "no problems" in the domain of interacting and relating with others. (Tr. 146.) Nevertheless, Ms. Edwards subsequently indicated that the claimant had an "obvious problem" with respecting and obeying adults in authority because she "sometimes" did not respect or obey them; and she had a "slight problem" expressing her anger appropriately. (Tr. 146.)

On January 5, 2010, the claimant's teacher, Jason Swanson, filled out a "School Activities Questionnaire" and indicated the following. (Tr. 198-99.) Mr. Swanson knew the claimant for half a year. (Tr. 198.) The claimant "often falls asleep for no reason, at least four times a day." (Tr. 199.) Further, she was "compliant with staff but can become combative with other students." (Tr. 199.)

On March 1, 2010, an annual review of the claimant's Individualized Education Program ("IEP") described the claimant as follows:[3]

> [The claimant] is an eighth grade student . . . . She is a conscientious young lady who works hard at everything she tries, even when she struggles. She loves to learn and likes to use the dictionary to discover the meanings of new and unfamiliar works. [She] tries hard at what she accomplishes and stays focused on the tasks she enjoys.

(Tr. 201.)

On February 28, 2011, an annual review of the claimant's IEP described the claimant as follows:[4]

> [The claimant] is currently a 9th grade student . . . . She is a very well behaved student who shows great interest in being academically successful.

---

[3] The IEP was effective May 25, 2010. (Tr. 200.)

[4] The IEP was effective February 28, 2011. (Tr. 216.)

8

> She participates in most classroom activities but at times has difficulties with staying awake. Her interactions with adults are positive but she can be argumentative with other students when provoked. When provoked by her peers [the claimant] can use profanity and issue threats directed towards them. She can be easily redirected by staff when she becomes angry. Their [sic] are times when she can become unresponsive to the teacher's directives to do her work due to sudden unexplained mood swings. This does not interfere with her grades because she is willing to do the makeup work on any missed assignments.
>
> She has had good academic success this year in most of her academic subject areas. . . . This is despite the fact that she has missed 26 school days this year. . . . Also, at times [the claimant] can fall asleep during teacher lead group instruction or even when working on a one on one situation.

(Tr. 217.)

### D. Hearing Testimony

The claimant testified at her hearing as follows. She had trouble getting along with her classmates because they teased her when she fell asleep. (Tr. 36.) She did not have friends at school; she sat by herself and did not talk to anyone, and she did not enjoy talking to anyone. (Tr. 36.) She did not have friends outside of school, either, but if she did she would "love to go to the mall and to the movies and have girls' nights out." (Tr. 36-37.) Instead, she "just [sat] in the house." (Tr. 37.)

The claimant "got along" with her teachers. (Tr. 37.) One teacher told her she had fallen asleep five times a day in school. (Tr. 37.) She did not always do her homework because she fell asleep when she returned home from school. (Tr. 86.) Sometimes she would sleep until dinner and return to sleep after dinner; other times she would awaken to take a shower and then return to sleep. (Tr. 39.) However, she performed all of her chores, including doing dishes, sweeping, and vacuuming. (Tr. 39.) The medications she took to help her remain awake "really don't work." (Tr. 39.)

9

Plaintiff testified at the claimant's hearing as follows.  The claimant's medication recently had been increased by her doctor because it was not working as well "as it should." (Tr. 41-42.)  Plaintiff rated the claimant's improvement at 4.5 on a scale to 10. (Tr. 42.)  The claimant's teacher told Plaintiff that the claimant fell asleep at school at least four times a day.  (Tr. 42-43.)  The claimant had missed 26 days of school because the claimant was sleepy, and Plaintiff often left home before the claimant and did not realize that the claimant failed to go.  (Tr. 43-44.)  The claimant returned home from school at 3:30 p.m., slept from 3:30 to 7:30 p.m., and went to bed at 9:00 p.m. (Tr. 45.)  The claimant had been suspended from school in the past, but had not been suspended in the current school year.  (Tr. 46.)

### III.  STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe" and that are

10

expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals[5] an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was . . . a school-age child on May 19, 2009, the date the application was filed, and is currently an adolescent.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3. The claimant has the following severe impairments: narcolepsy, borderline intellectual functioning, and obesity.

---

[5] To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if it the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).

11

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

   The claimant has marked limitation in acquiring and using information.

   The claimant has less than marked limitation in attending and completing tasks.

   The claimant has less than marked limitation in interacting and relating with others.

   The claimant has no limitation in moving about and manipulating objects.

   The claimant has less than marked limitation in the ability to care for herself.

   The claimant has less than marked limitation in health and physical well-being.

6. The claimant has not been disabled, as defined in the Social Security Act, since May 19, 2009, the date the application was filed.

(Tr. 12-20.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). Courts may look into any evidence in the

record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ. *Id.* However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. The ALJ's Assessment of Plaintiff's Domains of Functioning

The ALJ found that Plaintiff was markedly limited in the domain of acquiring and using information. Plaintiff contends that substantial evidence supports the conclusion that the claimant also was markedly limited in the domains of attending and completing tasks and interacting and relating with others. However, a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. As explained below, the ALJ's findings that the claimant was less than markedly limited in these domains are supported by substantial evidence.

The ALJ found that "[t]he overall record indicates that the claimant has less than

13

marked limitation in attending and completing tasks" and specifically discussed the following evidence. (Tr. 16.) Although school personnel noted the claimant was easily distracted and was "fidgety," she remained cooperative. (Tr. 16.) The claimant's May 2010 IEP indicated that the claimant worked hard and stayed focused on tasks that she enjoyed. (Tr. 16.) Dr. Leach found the claimant's concentration and persistence were "3/4 age appropriate." (Tr. 16.) And the claimant demonstrated a greatly improved ability to stay focused in the classroom with the use of medication. (Tr. 16.) Indeed, in December 2009, Dr. Khan noted that an increased amount of Ritalin had helped control the claimant's sleepiness "tremendously" and that the claimant was functioning better in school with no naps. (Tr. 13.) The ALJ conceded that the claimant continued to experience symptoms of narcolepsy, but to a lesser degree. (Tr. 13.) The ALJ concluded that the evidence showed "[t]he claimant's symptoms of narcolepsy are improved to the point to where she is able to stay awake in class and not nap, indicating that her symptoms are not as severe as alleged." (Tr. 13.) Further, the ALJ gave weight to Dr. Rivera's opinion that the claimant was less than markedly limited in attending and completing tasks. (*See* Tr. 14.)

The ALJ also found that the claimant was less than markedly limited in interacting and relating with others for the following reasons. Although the record showed the claimant had difficulties interacting with peers at times, it also showed the claimant demonstrated an ability to behave and interact with others. (Tr. 17.) The claimant testified she had no friends at school, but Dr. Leach reported that the claimant had long-standing friendships with her cousins. (Tr. 17.) Mr. Swanson reported that the claimant was compliant with school staff but could become combative with other

14

students; but Plaintiff reported that the claimant was not typically combative with her peers.  (Tr. 17.)  Indeed, Plaintiff reported to Dr. Leach that the claimant had no trouble getting along with siblings and peers.  (Tr. 17.)  School personnel reported that, although the claimant was easily distracted and "fidgety," she remained cooperative.  (Tr. 17.)  Finally, the ALJ gave weight to Dr. Rivera's opinion that the claimant was less than markedly limited in relating and interacting with others.  (*See* Tr. 14.)

In determining whether the ALJ's factual findings are supported by substantial evidence, courts must examine the evidence in the record taken as a whole and take into account whatever in the record fairly detracts from its weight.  See *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  Plaintiff points out that, although the evidence shows the claimant's sleepiness improved with medication, the claimant continued to fall asleep multiple times throughout the day.  In January 2010, Mr. Swanson reported that the claimant fell asleep four times a day.  In March 2010, Dr. Leach indicated that the claimant fell asleep during his interview of the claimant.  And the claimant's February 2011 IEP indicated that, at times, the claimant could fall asleep during teacher lead group instruction or when working in a one-on-one situation.  Plaintiff also contends that the evidence shows the claimant had trouble getting along with peers and had aggressive tendencies when provoked.

The evidence to which Plaintiff points does not so detract from the weight of the evidence upon which the ALJ relied that the ALJ's findings are unsupported.  Dr. Khan's observation that Plaintiff's condition had improved "tremendously" is not necessarily inconsistent with Mr. Swanson's report, as it is reasonable to conclude that Mr. Swanson's report of Plaintiff's sleepiness related to the claimant's condition over

15

the course of the prior six months and before the claimant presented to Dr. Khan. Despite the fact that Dr. Leach reported the claimant fell asleep during Dr. Leach's interview, Dr. Leach ultimately opined that Plaintiff's narcolepsy only mildly impaired her concentration and persistence.  And although the claimant's February 2011 IEP indicated the claimant could fall asleep, it also indicated that she had good academic success that year, which reasonably supports the ALJ's conclusion that the claimant's condition improved to the point where she could function despite her continued symptoms of narcolepsy.

The ALJ also relied on Dr. Rivera's opinion that the claimant was less than markedly limited in attending and completing tasks and interacting and relating with others, and Dr. Rivera's opinion is medical expert opinion evidence upon which the ALJ was permitted to rely.  See S.S.R. 96-6p, 1996 WL 374180, at *2 (S.S.A.).  The record evidence reasonably supports the ALJ's findings that the claimant was less than markedly limited in attending and completing tasks and in interacting and relating with others.  Accordingly, Plaintiff's assignments of error are not well taken.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  August 10, 2012